# In the

# United States Court of Appeals

## For the Seventh Circuit

No. 01-3861

THE MAY DEPARTMENT STORES COMPANY and THE MAY
DEPARTMENT STORES COMPANY RETIREMENT PLAN,

*Plaintiffs-Appellants,*

*v.*

FEDERAL INSURANCE COMPANY and NATIONAL UNION
FIRE INSURANCE COMPANY OF PITTSBURGH, PA.,

*Defendants-Appellees.*

Appeal from the United States District Court
for the Southern District of Illinois.
No. 99-164—**G. Patrick Murphy**, *Chief Judge.*

ARGUED MAY 24, 2002—DECIDED AUGUST 19, 2002

Before POSNER, MANION, and DIANE P. WOOD, *Circuit Judges.*

POSNER, *Circuit Judge.* This diversity suit for breach of a contract of liability insurance was brought by an ERISA pension plan (the May plan, we'll call it), and by the company (May) that sponsored and administers the plan, against two insurance companies, one of which however is an excess insurer whose liability to the plaintiffs need not be discussed separately. The insurance policy, which is called

an "Executive Protection Policy," was issued to May but names the plan as an additional insured. The district court granted summary judgment for the defendants.

A jurisdictional issue managed to elude notice by the district judge and—despite the stakes in the case and the sophistication of counsel—all four parties (well, three really, so far as legal advice is concerned, because May and the plan have the same counsel). The jurisdictional statement in the appellants' opening brief properly alleges the citizenship of the corporate plaintiff and of the defendants, but with regard to the pension plan states only that it "is a defined benefit plan with its principal place of business in Missouri." The jurisdictional statements in the appellees' briefs state incorrectly that the appellants' jurisdictional statement is complete and correct. It seems that we shall have to keep repeating until we are blue in the face that whenever a party to a diversity suit is neither a business corporation nor a human being, the district judge and the lawyers for the parties must do careful legal research to determine the citizenship of the party rather than content themselves with making a wild stab in the dark, as the parties did in this case when they chose the principal place of business to be the state of citizenship of a pension plan, a choice for which there is no basis in law. While we are about chastising the parties for their insouciance regarding the existence of federal jurisdiction, we note our displeasure at the conduct of the appellants' counsel, Covington & Burling, in having without our authorization appended to its response to our jurisdictional query what amounts to a second reply brief, purporting to correct a factual error in its previous briefs; and in having, in its opening brief, used ellipses in quotations to create a misleading impression of the meaning of the quoted passages. These tactics are especially unworthy of so distinguished a law firm.

The May plan is a trust, and for diversity purposes a trust is a citizen of whatever state the trustee is a citizen of. *Navarro Savings Ass'n v. Lee*, 446 U.S. 458, 464-46 (1980); *Hemenway v. Peabody Coal Co.*, 159 F.3d 255, 257 (7th Cir. 1998); *E.R. Squibb & Sons, Inc. v. Accident & Casualty Ins. Co.*, 160 F.3d 925, 931 (2d Cir. 1998). The trustee of the May plan, the Bank of New York, happens to be a citizen of the same state as one of the defendants, and so the requirement of complete diversity is not satisfied. Against this conclusion the defendants argue that since the Bank of New York was merely a "directed" trustee, meaning that its decisions regarding the investment of the trust assets were dictated by the plan administrator, the latter should be considered the "real" trustee for diversity purposes. But it would be a mistake to complicate the ascertainment of jurisdiction by making it turn on the precise division of responsibilities between the plan trustee and the plan administrator. We have in the past resisted efforts to base determinations of citizenship on functional considerations, see *Downey v. State Farm Fire & Casualty Co.*, 266 F.3d 675, 680 (7th Cir. 2001); *CCC Information Services, Inc. v. American Salvage Pool Ass'n*, 230 F.3d 342, 345-46 (7th Cir. 2000); see also *Saadeh v. Farouki*, 107 F.3d 52, 57 (D.C. Cir. 1997); *SHR Ltd. Partnership v. Braun*, 888 F.2d 455, 458-59 (6th Cir. 1989), and we will continue to do so.

In response to our order that the parties address the jurisdictional issue that we had identified, however, all the parties agree that if indeed the presence of the plan as a party to this litigation destroys complete diversity, as it does, the plan should be dropped as a party, a method of preserving diversity jurisdiction approved by the Supreme Court in *Newman-Green, Inc. v. Alfonzo-Larrain*, 490 U.S. 826, 837 (1989); see also *Wild v. Subscription Plus, Inc.*, 292 F.3d 526, 529 (7th Cir. 2002). In support of this sug-

gestion the parties argue at length that the May plan is not an indispensable party to this lawsuit, Fed. R. Civ. P. 19, and so is indeed "droppable," whereas if the plan were indispensable the litigation could not proceed in its absence. Fed. R. Civ. P. 19(b); 4 *Moore's Federal Practice* §19.02[2][a], p. 19-10, § 19.02[2][d], p. 19-17 (3d ed. 2002). No one is arguing that the plan is indispensable, but even so there is an independent judicial interest that occasionally blocks an effort to keep a suit going by dropping a party whose presence destroys jurisdiction. Suppose the May plan intended to bring its own suit, necessarily (because of lack of diversity) in state court. In that event, if we dropped it from the present suit we would be creating two suits where there had been only one. To avoid the extra burden on the judiciary, we would be inclined in such a case to dismiss the present suit rather than to drop the plan as a party. See *Sta-Rite Industries, Inc. v. Allstate Ins. Co.*, 96 F.3d 281, 287 (7th Cir. 1996). But the May plan has committed itself in writing to abide by whatever judgment we issue, so there is no danger of a second, identical suit.

The Executive Protection Policy gave May $25 million in insurance coverage for liability to May or the plan for "any breach of the responsibilities, obligations or duties imposed upon fiduciaries of the Sponsored Plan [the May plan] by [ERISA], or by the common or statutory law of the United States, or any state or other jurisdiction anywhere in the world," unless the breach is "willful" or—critically—unless the loss for which liability is sought to be fastened on the insureds "constitutes benefits due or to become due under the terms of a Benefit Program," which in this case is the May plan. The policy was of course drafted by the insurer, and ordinarily that would require that ambiguities in it be resolved in favor of the insured. *Eagle Leasing Corp. v. Hartford Fire Ins. Co.*, 540 F.2d 1257, 1262 (5th Cir. 1976), however, interpreting Missouri law,

which is agreed to govern the substantive issues in this case, held that this doctrine requiring that contracts be construed against the drafter was inapplicable when the insured is a sophisticated business rather than a hapless individual. (To the same effect, see *Koch Engineering Co. v. Gibraltar Casualty Co.*, 878 F. Supp. 1286, 1288 (E.D. Mo. 1995), aff'd, 78 F.3d 1291 (8th Cir. 1996); and see generally *Beanstalk Group, Inc. v. AM General Corp.*, 283 F.3d 856, 858-59 (7th Cir. 2002).) But in cases decided by the Missouri courts in the years since *Eagle*, such as *Peters v. Employers Mutual Casualty Co.*, 853 S.W.2d 300, 302 (Mo. 1993), and *Robin v. Blue Cross Hospital Service, Inc.*, 637 S.W.2d 695, 697-98 (Mo. 1982), these courts have continued to invoke the doctrine in cases involving commercially sophisticated insureds, without referring to *Eagle* or engaging with Judge Wisdom's reasoning in that case. Is this deliberate or inadvertent indifference? Who knows; but it is of no consequence in this case, as we think there is no room for reasonable doubt that the insurance company has the better of the interpretive dispute with the insureds. The doctrine is a tie-breaker, and there is no tie.

Within the two-year period in which the Executive Protection Policy (a claims-made policy, not an occurrence policy) was in effect, May and the May plan were sued together in two class actions brought on behalf of plan participants. Eventually both class actions were settled for a total amount of money that, though oddly enough the parties cannot agree on what it was, at any rate exceeded $25 million. The insurers contend and the district court agreed that the suits sought plan benefits and so the amount for which May settled was excluded from coverage under the policy.

In one of the class actions the complaint was about the interest rate that the plan had specified for converting

an annuity to a lump sum, alternatives between which the plan allows participants to choose when they have vested retirement benefits but leave May's employ before reaching retirement age. ERISA requires that, when such a choice is given, the lump sum must be the actuarial equivalent of the annuity. 29 U.S.C. § 1054(c)(3). The class charged that the interest rate specified in the plan for converting the annuity to which the members of the class would otherwise have been entitled to the lump sum that they chose did not produce an actuarial equivalent and so violated ERISA. The suit sought the difference between that equivalent and the (smaller) lump sum the class members actually received, plus interest. The other class action complained about the plan's failure, in violation of a regulation issued under ERISA, 29 C.F.R. § 2530.203-3, to notify employees who continued working after retirement age that they would receive no retirement benefits until they retired and, when they did finally retire, no additional benefits to make up for what they had lost by virtue of their delayed receipt of retirement benefits that they had earned. If, properly notified, they had continued working, this would have operated as a lawful forfeiture. 29 C.F.R. § 2530.203-3(b)(4); *Whisman v. Robbins*, 55 F.3d 1140, 1145-46 (6th Cir. 1995); *Deak v. Masters, Mates & Pilots Pension Plan*, 821 F.2d 572, 575 n. 5 (11th Cir. 1987). But since they had not been notified, they were entitled to the actuarial equivalent of what their retirement benefits would have been worth had they retired earlier and had thus had the use of the benefits for the intervening years.

In both cases the legal basis of the claims against May was not language in the plan but provisions of ERISA (or, what amounts to the same thing, a regulation issued by the Department of Labor under ERISA), and this means, according to May, that the claims were not for benefits

and so did not come within the exclusion. That is incorrect. *Viacom Int'l, Inc. v. Federal Ins. Co.*, No. 95 Civ. 915, 1997 WL 154042, at *1-2, 5 (S.D.N.Y. Apr. 2, 1997); *Sokolowski v. Aetna Life & Casualty Co.*, 670 F. Supp. 1199, 1201-03, 1206-07 (S.D.N.Y. 1987); cf. *Morlan v. Universal Guaranty Life Ins. Co.*, No. 01-3795, 2002 WL 1729527, at *3 (7th Cir. July 26, 2002). The benefits sought were plan benefits; the question was how to compute them. The answer was given by ERISA, but that is just to say that, like many other contracts, pension plans governed by ERISA contain provisions implied by law. See, e.g., *A.E.I. Music Network, Inc. v. Business Computers, Inc.*, 290 F.3d 952, 955-56 (7th Cir. 2002). ERISA is not a government pension scheme, like social security. It is not a source of pension benefits, but a regulation of private pension plans. It is a paternalistic regulation, intruding on the freedom of the contracting parties, the plan and its participants, every step of the way, so the position urged by May would if adopted open an enormous gap in the liability insurance policy's exclusion of benefits claims.

It would be passing strange for an insurance company to insure a pension plan (and its sponsor) against an underpayment of benefits, not only because of the enormous and unpredictable liability to which a claim for benefits on behalf of participants in or beneficiaries of a pension plan of a major employer could give rise, but also because of the acute moral hazard problem that such coverage would create. ("Moral hazard" is the term used to denote the incentive that insurance can give an insured to increase the risky behavior covered by the insurance.) Such insurance would give the plan and its sponsor an incentive to adopt aggressive (just short of willful) interpretations of ERISA designed to minimize the benefits due, safe in the belief that if, as would be likely, the interpretations were rejected by the courts, the insurance com-

pany would pick up the tab. Heads I win, tails you lose. May's interpretations of ERISA that provoked the class actions were indeed aggressive, consciously so in fact, the record shows. The unlikelihood that a party to a contract would agree to an interpretation had it been explicitly proposed when the contract was negotiated is a reason, not controlling in itself of course but relevant, for finding that it did not agree. We note here the relevance to contract interpretation, including insurance-contract interpretation, of the amount of consideration. *Hartford Fire Ins. Co. v. St. Paul Surplus Lines Ins. Co.*, 280 F.3d 744, 747-48 (7th Cir. 2002); *PMC, Inc. v. Sherwin-Williams Co.*, 151 F.3d 610, 615 (7th Cir. 1998); *Rhone-Poulenc Inc. v. International Ins. Co.*, 71 F.3d 1299, 1303 (7th Cir. 1995). The smaller it is in relation to the performance claimed to be due the promisee, the less plausible the claim. The premium for the primary coverage of $25 million averaged only $80,000 a year, a meager amount considering the risk to which May's interpretation of the benefits exclusion, if accepted, would expose the insurer.

Against these considerations May makes two arguments. The first is that if the policy does not cover benefits paid in response to a claim of a violation of ERISA, its coverage is illusory, compare *Buck v. American Family Mutual Ins. Co.*, 921 S.W.2d 96, 98-99 (Mo. App. 1996); *Krombach v. Mayflower Ins. Co.*, 785 S.W.2d 728, 734 (Mo. App. 1990); *I/N Kote v. Hartford Steam Boiler Inspection & Ins. Co.*, 115 F.3d 1312, 1320 (7th Cir. 1997), meaning that May got nothing in exchange for its premiums. (So this is the converse interpretive principle of that in the preceding paragraph. Both are based on the assumption that contracts generally are not completely one-sided.) Not so. As the name "Executive Protection Policy" implies, the policy is the equivalent of a D & O (directors' and officers') policy, *Northwest Airlines, Inc. v. Federal Ins. Co.*, 32 F.3d

349, 351 (8th Cir. 1994); cf. *American Casualty Co. v. Hotel & Restaurant Employees & Bartenders Int'l Union Welfare Fund*, 894 P.2d 371, 372-73 (Nev. 1995) (per curiam), which insures corporations, along with the directors and officers themselves, against liability arising from directors' and officers' breaches of their fiduciary duties. See, e.g., *Harbor Ins. Co. v. Continental Bank Corp.*, 922 F.2d 357, 359 (7th Cir. 1990); *FDIC v. American Casualty Co.*, 843 P.2d 1285, 1287-88, 1283-94 (Colo. 1992); *Quinlan v. Liberty Bank & Trust Co.*, 575 So. 2d 336, 338-39 (La. 1990). May, which, remember, directs the investments of the plan's assets, might during the policy period have violated the prudent-man rule or some other limitation on trust investments, depleting the plan's assets; the violation, unless willful, would be covered by the policy. Such violations are not so uncommon as to render coverage of them a negligible or illusory benefit of the insurance policy.

May's second argument points us to the statutory distinction between a suit "to recover benefits due to [a plan participant or beneficiary] under the terms of his plan," 29 U.S.C. § 1132(a)(1)(B), and a suit "by a participant, beneficiary, or fiduciary (A) to enjoin any act or practice which violates any provision of [ERISA] or the terms of the plan, or (B) to obtain other appropriate equitable relief (i) to redress such violations or (ii) to enforce any provisions of [ERISA] or the terms of the plan." 29 U.S.C. § 1132(a)(3). May claims that the class actions against it were brought under the latter subsection. If we are correct that "terms of his plan" include terms implied by law, it is irrelevant under which provision the class actions were brought. What was being sought were benefits, and characterizing an award of benefits as a form of equitable relief would not bring it outside the exclusion in the policy. But anyway such a characterization would be improper in a case such as this in which a suit for benefits

provides all the relief that the plaintiff is seeking. *Conley v. Pitney Bowes*, 176 F.3d 1044, 1047 (8th Cir. 1999); see also *Smith v. Contini*, 205 F.3d 597, 606 (3d Cir. 2000). This conclusion is compelled by the fundamental principle that equitable relief is available only when legal relief is not, a condition not satisfied when a plaintiff can obtain all he wants in a suit for benefits.

This is not to say that money can never be recovered in a suit in equity; quite apart from the equity clean-up doctrine, which allows an equitable suitor to obtain incidental damages relief in his equity suit so as to spare himself, the defendant, and the judiciary the burden of two suits on the same claim, *Medtronic, Inc. v. Intermedics, Inc.*, 725 F.2d 440, 442 (7th Cir. 1984); *Mowbray v. Moseley, Hallgarten, Estabrook & Weeden, Inc.*, 795 F.2d 1111, 1114 (1st Cir. 1986); *Clark v. Teeven Holding Co.*, 625 A.2d 869, 881-82 (Del. Ch. 1992), wrongful withholding of benefits due can entitle the beneficiary to impose a constructive trust on interest on the withheld benefits, an equitable remedy that results in a money payment to the plaintiff. *Clair v. Harris Trust & Savings Bank*, 190 F.3d 495, 498-99 (7th Cir. 1999); *Dunnigan v. Metropolitan Life Ins. Co.*, 277 F.3d 223, 229 (2d Cir. 2002). By withholding benefits, a plan can obtain interest that would otherwise be obtained by the beneficiary. That interest is not itself a benefit, and so the beneficiary cannot bring a suit under (a)(1)(B) to recover it. But he can sue to recover it under (a)(3), because it is an amount by which the plan has unjustly enriched itself, and unjust enrichment is a basis, indeed the usual basis, for imposing a constructive trust on a sum of money. *Wsol v. Fiduciary Management Associates, Inc.*, 266 F.3d 654, 656 (7th Cir. 2001); *Clair v. Harris Trust & Savings Bank, supra*, 190 F.3d at 498; *Fisher v. Trainor*, 242 F.3d 24, 31 (1st Cir. 2001). The class action suits here, however, were for plan benefits. They were suits at law,

suits under (a)(1)(B). True, the class action concerning the commutation of the annuity to a lump sum sought interest as well as benefits, but interest on an amount claimed as damages, the usual prejudgment or postjudgment interest, is a legal, not an equitable, remedy, *SEC v. Lipson*, 278 F.3d 656, 663 (7th Cir. 2002), unless it is measured by the amount wrongfully earned by the defendant, which would make it a claim for unjust enrichment. Even so, that would not convert the entire suit into a suit for equitable relief.

There is another difficulty with May's statutory argument. With (a)(1)(B) authorizing suits to recover plan benefits and (a)(3) authorizing suits for injunctive relief, what was the authority for the class action suits? They were not injunctive in character, but sought benefits due, May argues, not under the plan but under ERISA itself. The only suits authorized by (a)(1)(B) are suits to recover "*contractual* claims" for benefits. *Harsch v. Eisenberg*, 956 F.2d 651, 655 (7th Cir. 1992) (emphasis in original). The implication of May's argument is that there was no statutory basis for the class actions, no remedy for its violations of ERISA. That argument if accepted would create a huge hole in the statute.

We conclude that there was indeed no insurance coverage for the benefits May agreed to pay in settlement of the class actions. The judgment for the defendants must therefore be affirmed, but with the following modification: the May plan is dismissed from the suit, with prejudice, but by agreement of the parties concurred in by this court rather than on the merits.

MODIFIED AND AFFIRMED.

A true Copy:

Teste:

_____
*Clerk of the United States Court of*
*Appeals for the Seventh Circuit*